**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TANNAZ WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 24-cv-01459 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| ENDURANCE WARRANTY SERVICES, LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tannaz Williams, a vehicle service contract salesperson formerly employed by Defendant Endurance Warranty Services, LLC ("Endurance"), has been clinically diagnosed with anxiety, depression, and post-traumatic stress disorder. To deal with those conditions while maintaining her job, she requested, and was granted, leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615. Over a year later, Endurance fired Williams for what it claimed was her failure to meet performance standards. In response, Williams brought this action under the FMLA alleging that Endurance both interfered with her use of FMLA leave and retaliated against her. Endurance now seeks summary judgment on both claims. (Dkt. No. 24.) For the reasons that follow, Endurance's motion is granted.

**BACKGROUND**

The following facts are undisputed unless otherwise noted.

Endurance is in the business of selling vehicle service contracts. (Pl.'s Resp. to Def.'s Statement of Material Facts ("PRDSMF") ¶ 1, Dkt. No. 29-1.) From March 9, 2020, until her termination on July 14, 2023, Williams was employed as a sales representative for Endurance. (*Id.* ¶¶ 4, 7, 73.) In that role, Williams was required to hit specified sales metrics. (*Id.* ¶ 7.)

Indeed, all sales representatives were required to hit certain targets, those targets were communicated to Williams daily, and all representatives within a business channel had the same minimum targets. (*Id.* ¶¶ 7, 9.) Some of the relevant metrics tracked by Endurance were inbound closing percentage ("INBCR"), outbound closing percentage ("OBCR"), after call wrap percentage ("ACW"), unavailable ("UA") time, and average deals sold per day. (*Id.* ¶¶ 8, 16, 17, 21.) All of Williams's target metrics were rate-based, rather than volume-based, metrics. (*Id.* ¶ 71.)

On April 1, 2022, Endurance placed Williams on the Acceleration Team, a coaching team intended to help representatives improve their sales. (*Id.* ¶ 10.) Williams was placed on the Acceleration Team because she failed to hit her sales targets, and the placement occurred before she applied for FMLA leave later that month. (PRDSMF ¶ 10; Def.'s Resp. to Pl.'s Statement of Additional Facts ("DRPSAF") ¶ 3, Dkt No. 30.) During Williams's time on the Acceleration Team, she received additional resources and coaching. (PRDSMF ¶ 11.) Her performance significantly improved during this period and Williams graduated from the Acceleration Team early. (DRPSAF ¶ 3.)

At some point in March 2022, Williams was diagnosed with anxiety and depression. (PRDSMF ¶ 50.) Williams's symptoms include flare-up depressive or anxious episodes, crying episodes, and failure to concentrate. (DRPSAF ¶ 2.) On April 15, 2022, Williams submitted a completed and signed FMLA certification form to Endurance. (PRDSMF ¶ 51.) This initial certification estimated that Williams's condition would likely last six months and would require planned medical treatment every two weeks. (*Id.* ¶ 52.) In addition, the certification stated that Williams would require five absences per month due to flare-ups of her condition. (*Id.*)

On April 21, 2022, Williams submitted a Leave of Absence Request Form requesting intermittent leave due to her condition and certifying that she would review the Endurance handbook leave policies. (*Id.* ¶ 54.) Endurance's FMLA policy included guidance that "calling in" sick, without providing an explanation for the needed leave, is not considered sufficient notice for FMLA leave. (*Id.* ¶ 3.) Moreover, the policy states that, when an employee seeks to use leave for a previously approved FMLA-qualifying reason, she must specifically reference the reason or the need for FMLA leave when making her request. (*Id.*)

Williams understood, and was reminded, that she needed to communicate with her supervisor in advance of any planned absences. (*Id.* ¶¶ 55–56.) Williams then used intermittent FMLA leave on April 29, June 10, and July 22, 2022. (*Id.* ¶ 57.) Williams was also absent for all or part of her shifts on July 26, July 27, and July 29, 2022, but the parties dispute whether she contemporaneously told Endurance that the days should be designated as FMLA leave. (*Id.* ¶ 58.) Regardless, Endurance later retroactively designated those days as intermittent FMLA leave. (*Id.* ¶ 60.)

On October 19, 2022, Williams messaged Linda Wallace, a Human Resources ("HR") Generalist at Endurance, and stated that she had suffered two panic attacks since arriving at work that morning and had "just called out with [FMLA]." (*Id.* ¶ 62.) Wallace responded by writing: "As discussed this is not how we utilize intermittent FMLA . . . it needs to be used for scheduled appointments, physical therapy etc. . . . however, if you are not able to come in yes you will need to call in as you did." (PRDSMF ¶ 62; Def.'s Statement of Material Facts Ex. B, Ex. 44, Dkt. No. 26-3 (ellipses in original).)

On October 27, 2022, Williams told Wallace that she had taken half of the prior day off to see her psychiatrist, although, prior to telling Wallace, she "never told anyone why" she took a half day. (PRDSMF ¶ 65.)

Weeks later, around November 11, 2022,[1] Wallace sent Williams a message stating that her "condition is covered under FMLA but every company may not use FMLA the same [way]." (PRDSMF Ex. D, Dkt. No. 29-5.) "[I]f you have scheduled appointments, therapy, physical therapy etc [sic] you can use days under FMLA intermittent . . . [but] if you call in you have to use PTO." (*Id.*) Then, on November 11, 2022, Wallace sent the following message to Williams:

> As of today, you have a total of 348 hours of intermittent FMLA remaining. Please keep in that [sic] calling in places an unfair burden on the team. If you call in for days pertaining to your condition you can be subject to our attendance policy/point which can result in disciplinary action. To avoid this once you are made aware of any appointments pertaining to your medical condition, please be sure to notify your manager in advance so that he can make necessary arrangements to ensure coverage for the department.

(*Id.*)

Following this mid-November message exchange with Wallace, Williams continued to take intermittent FMLA leave for flare-ups of her condition. (PRDSMF ¶ 67.) Specifically, she took leave on November 15, 2022, and again on seven other days through March 2023. (*Id.*) Later, Williams took a full week of FMLA leave in April and continued to take intermittent leave for anxiety-related flare-ups in May, June, and July 2023. (*Id.* ¶ 69.) Endurance never denied one of Williams's requests to take time off for her health condition. (*Id.* ¶ 70.) Although no request

[1] The date on which this message was sent is not clear from the cited exhibit, which is a screenshot of a conversation on an instant messaging application. The screenshot includes a date and time stamp for the message that immediately follows, but it is possible the messages were sent on different dates. The quoted conversation immediately precedes messages sent on the morning of November 11, 2022.

was denied, Williams asserts—and Endurance disputes—that she occasionally chose not to take intermittent FMLA leave for fear of disciplinary action. (DRPSAF ¶ 5.)

Meanwhile, as Williams navigated the FMLA process, she continued to work to improve her on-the-job performance. (PRDSMF ¶¶ 12–14.) After graduating from the Acceleration Team, Williams was assigned to report to Tyler Everton, beginning May 2, 2022. (*Id.* ¶ 12.) She was simultaneously placed on a performance improvement plan ("PIP") for 30 days and given steps to follow to improve her performance. (*Id.* ¶ 13.)

On August 12, 2022, Everton met with Williams to discuss her job performance and issued a corrective action regarding instances of tardiness and absence without proper advance communication.[2] (*Id.* ¶ 15.) From September 30, 2022, until Williams was transferred to a new manager in March 2023, Everton issued four PIPs to Williams. (*Id.* ¶¶ 16, 21, 25, 31.) Those PIPs were tied to improving specific sales metrics, such as INBCR, OBCR, ACW, and average deals sold per day. (*Id.* ¶¶ 17, 29.) Everton repeatedly warned Williams that her performance was below expectations and that she could face discipline and termination if she failed to improve. (*Id.* ¶¶ 24, 29.) And throughout this period, Williams understood that her performance was not meeting company expectations and that she could be discharged for failing to improve. (*Id.* ¶¶ 18, 30.)

Throughout the time Everton supervised Williams, he worked with her to try to ensure her success at Endurance. (*Id.* ¶ 27.) In addition to the warnings and PIPs, Everton met with Williams one-on-one, sent her coaching packages, set up a shadowing opportunity with other

[2] As noted above, Williams maintains that three of the dates listed on this corrective action (July 26, 27, and 29, 2022) were FMLA leave and that she provided proper notice for her use of leave. She does not dispute that the conversation with Everton occurred or that she was issued a corrective action, which covered dates other than just the three July dates to which she objects.

sales representatives, and gave her advice. (*Id.* ¶¶ 13, 23.) Everton also granted Williams's requests to shift her schedule so that she could work on days with historically higher close ratios. (*Id.* ¶ 28.) As part of the final PIP issued under Everton, Williams was assigned to attend weekly sales coaching calls, to review coaching sessions, and was given advice about limiting unnecessary hold times. (*Id.* ¶ 34.)

In March 2023, Williams was transferred to a new supervisor, Amanda Crouch. (*Id.* ¶ 35.) Crouch issued Williams a tactical plan for April 25, 2023, through May 25, 2023, which indicated that Williams had missed three statistical targets for the prior period. (*Id.*) Crouch issued a second tactical plan for the period of May 21, 2023, through June 17, 2023, this time noting that Williams was not hitting any of her statistical targets. (*Id.* ¶ 38.) Crouch also issued three PIPs to Williams on June 7, June 26, and July 10, 2023. (*Id.* ¶¶ 40, 43, 47.) The June 26 and July 10 PIPs were marked as "final."[3] (*Id.* ¶¶ 43, 47.) Endurance continued to provide Williams with one-one-one coaching sessions with Crouch and additional coaching packages. (*Id.* ¶ 37.) And throughout the period she worked with Crouch, Williams understood that she was not meeting Endurance's performance expectations. (*Id.* ¶¶ 36, 42, 49.) Yet Williams never displayed consistent, sustained improvement in her ability to meet sales metrics. (*Id.* ¶¶ 45, 49.)

In mid-2023, Endurance's Chief Human Resources Officer asked Lev Yanovskiy, Endurance's Sales Director, to produce a document detailing Williams's performance statistics year-to-date. (*Id.* ¶ 72.) Those statistics showed that Williams's performance throughout the entire year was below average. (*Id.*) Endurance terminated Williams on July 14, 2023. (PRDSMF ¶ 73; DRPSAF ¶ 11.)

---

[3] Williams disputes the characterization of either PIP as "final" because, she argues, one version of an earlier PIP issued on October 28, 2022, was also marked as "final." However, she does not dispute that the June 26 and July 10 PIPs themselves were marked as "final."

Following her termination, Williams filed a one-count Verified Complaint alleging that Endurance violated the FMLA by interfering with her exercise of rights under the statute and retaliating against her for exercising those rights. Endurance now moves for summary judgment. (Dkt. No. 24.)

**DISCUSSION**

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). The Court must construe the "evidence and all reasonable inferences in favor of" the non-moving party. *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). However, the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (internal quotation marks omitted). When the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial," a court must grant summary judgment. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

The "FMLA grants eligible employees up to 12 workweeks of unpaid leave (480 hours) per year for medical and family reasons." *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022). "To protect these rights, the FMLA prohibits covered employers from (i) interfering with, restraining, or denying the exercise of FMLA rights; and (ii) discriminating or retaliating against employees for exercising FMLA rights. The FMLA also grants employees a right of action to recover damages for violations of these provisions." *Id.* at 1084 (internal citations omitted). Williams asserts claims based on both theories. First, she argues that Endurance interfered with

the exercise of her FMLA rights. Second, she argues that, by firing her, Endurance retaliated against her for exercising FMLA rights.

## I. FMLA Interference

An employee claiming FMLA interference must show that: (1) she was eligible for FMLA protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer interfered with, restrained, or denied FMLA benefits to which he was entitled. *Juday v. FCA US LLC*, 57 F.4th 591, 595 (7th Cir. 2023). But even if "a plaintiff shows a violation of § 2615(a)(1)"—that is, FMLA interference—"winning relief requires the plaintiff to show 'prejudice,' meaning harm resulting from the violation." *Ziccarelli*, 35 F.4th at 1084.

At this stage, Endurance only contests the fifth element. Endurance primarily argues that it did not interfere with Williams's rights because it never denied her requests for intermittent FMLA leave. In the alternative, it argues that Williams's interference claim must fail because she did not suffer harm from any potential violation.

Endurance cites several cases purportedly standing for the proposition that denial of FMLA leave is essential for an employee to prevail on an interference claim. *See, e.g.*, *Larson v. Motor Werks of Barrington, Inc.*, No. 15 C 5572, 2018 WL 287747, at *8 (N.D. Ill. Jan. 4, 2018) ("A plaintiff's admission that his employer never denied him an opportunity to take FMLA leave is 'fatal' to an interference claim." (quoting *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 498 (7th Cir. 2014)). Recently, however, the Seventh Circuit, recognizing the "confusion" stemming from the "varying language" used in its opinions on FMLA interference, clarified what is necessary to show a violation. *Ziccarelli*, 35 F.4th at 1084. The Seventh Circuit stated unequivocally that "a violation [of the FMLA] does not require actual denial of FMLA

benefits." *Id.* at 1085. "An employer can interfere with or restrain rights under the FMLA without explicitly denying a leave request." *Id.* at 1085–86. Indeed, a plaintiff can prevail on an interference claim by proving that an employer discouraged employees from requesting FMLA leave. *Id.* at 1086; *see also Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 818 (7th Cir. 2015) (finding evidence that an employer discouraged an employee from taking FMLA leave sufficient to create an issue of triable fact).

The undisputed facts in this case show that Endurance never denied Williams's requests for leave. But her interference claim may nonetheless survive if she can show that Endurance discouraged her from exercising her right to take FMLA leave. Williams largely relies on the messages sent by Wallace to make this showing.

As described above, three of Wallace's statements are relevant here. First, after Williams left work early following panic attacks, Wallace communicated to her that "this is not how we utilize intermittent FMLA . . . it needs to be used for scheduled appointments." (PRDSMF ¶ 62.) Second, a later message from Wallace again stated that Williams could only use FMLA leave for scheduled medical appointments and that if she called in sick, she would need to use paid time off ("PTO"). Finally, in the November 11, 2022, message, Wallace noted Williams's remaining FMLA leave allotment, reminded her that calling in sick places an unfair burden on her team, and told her that calling in sick related to her condition could result in disciplinary action.

When considering a discouragement theory of interference, "the critical question is whether the employer's actions would discourage a reasonable employee from taking FMLA leave." *Preddie*, 799 F.3d at 818 n.35. In the Court's view, these messages could reasonably be interpreted in favor of either party. On the one hand, Wallace's messages fall short of those cases where an employer explicitly told the employee not to take any more time off from work,

actively discouraging FMLA leave in the process. For example, in *Preddie*, the Seventh Circuit found evidence of discouragement where the employer told the plaintiff that he had already missed a lot of work and that he could not take off more time to care for his son. *Id.* at 818 ("***You can't take off.***"). Similarly, in *Ziccarelli*, the employer allegedly told the employee: "[Y]ou've taken serious amounts of FMLA . . . . [D]on't take any more FMLA." 35 F.4th at 1082.

Here, in contrast, Wallace did not tell Williams that she could not or should not take further time off from work. In fact, she explicitly confirmed that she could take more time off, if needed. Moreover, in at least one instance prior to November 11, 2022, Williams left work early for a scheduled appointment with her psychiatrist, rather than because of a flare-up of her symptoms. She did not tell anyone the reason for that partial absence, meaning she did not provide the advance notice required, when possible, under Endurance's FMLA policy. Wallace's messages could reasonably be interpreted as poorly phrased attempts to ensure that Williams complied with the notice requirements of the FMLA policy.

On the other hand, by suggesting that Williams had to use PTO, rather than intermittent FMLA leave, for flare-ups of her symptoms, Wallace misstated the law and mischaracterized Endurance's policy. *Small v. Touchette Reg'l Hosp., Inc.*, No. 23-CV-3629, 2026 WL 873909, at *8 (S.D. Ill. Mar. 31, 2026) ("The FMLA permits an employee with a chronic condition to take intermittent leave as needed for flare-ups, follow-up treatment, or symptoms, and the absences qualify for FMLA leave even if the employee does not receive treatment from a health care provider during the absence . . . ."); (Def.'s Statement of Material Facts Ex. B, Endurance Handbook 35, Dkt. No. 26-3 ("[E]mployees also are entitled to take FMLA leave intermittently or on a reduced leave schedule when medically necessary . . . .").) Indeed, Williams's FMLA certification indicated that she would require up to five absences per month due to flare-ups.

In addition, Wallace's November 11, 2022, message raised the specter of disciplinary action. A reasonable person could interpret that message as stating that Williams could be disciplined for calling in sick without explanation. But, combined with Wallace's inaccurate guidance on the use of FMLA leave, a reasonable person might alternatively conclude that the message threatened discipline based on permissible use of intermittent leave. A reasonable person might be discouraged by such a threat. *See Ziccarelli*, 35 F.4th at 1090 ("Threatening to discipline an employee for seeking or using FMLA leave to which he is entitled clearly qualifies as interference with FMLA rights.").

Keeping in mind that the Court must draw "all reasonable inferences in favor of" the non-moving party, *Rickher*, 535 F.3d at 664, the Court finds that a reasonable jury could conclude that Wallace's messages discouraged Williams from using FMLA leave. But while there is a triable issue of fact as to whether Endurance interfered with Williams's rights under the FMLA, that alone is not enough to defeat summary judgment.

A plaintiff "cannot prevent summary judgment by creating a fact question over [the employer's] lack of compliance with the FMLA—he must show he was injured by [the employer's] violation. Violation of the FMLA is not enough to establish injury; instead, [the plaintiff] must show he was prejudiced by [the employer's] violation." *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 368 (7th Cir. 2020). To show prejudice, and thereby survive summary judgment, Williams must show "[s]he would have structured [her] leave differently" if not for Wallace's messages. *Id.*

The parties vigorously dispute whether Williams can show that she was prejudiced by Wallace's comments. Williams, relying solely on her own deposition testimony, argues that Wallace's comments left her confused about her rights. (DRPSAF ¶ 5.) As a result, she claims

that she occasionally chose to come into work, rather than use FMLA leave, when experiencing flare-ups of anxiety or depression. (*Id.*) For its part, Endurance contends that this claim is undermined by Williams's frequent use of intermittent FMLA leave following the conversation with Wallace.

Williams bears the burden of showing prejudice. *Lutes*, 950 F.3d at 368 ("[The plaintiff] must show that he was prejudiced by [the] violation."); *see also Celotex*, 477 U.S. at 322 (finding summary judgment mandatory where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial"). And as she correctly points out, evidence of a link between an employer's alleged discouragement and an employee's decision not to take available FMLA leave is sufficient to create a fact question for the jury. *Ziccarelli*, 35 F.4th at 1090. However, an essential part of that equation is evidence that the employee chose not to take FMLA leave that was otherwise available to her. Williams presents no such evidence here.

In *Ziccarelli*, the court found evidence in the record that the plaintiff planned to use some of his remaining FMLA leave for medical treatment. *Id.* But, after a conversation with his employer, the plaintiff never submitted an FMLA request and did not use any of his remaining FMLA leave for that year. *Id.* Likewise, in *Preddie*, the plaintiff testified to a specific instance where he would have taken FMLA leave to care for his son but instead went to work for fear of repercussions. 799 F.3d at 818. And, as in *Ziccarelli*, after the allegedly discouraging conversation, the plaintiff in *Preddie* did not miss any additional days of work for FMLA-qualifying reasons. *Id.* Critically, in both cases, the plaintiff presented evidence showing that there were concrete situations where they would have taken leave but did not because of their

employer's discouragement. In other words, they could show that they "would have structured [their] leave differently." *Lutes*, 950 F.3d at 368. Williams is differently situated.

Williams testified generally that there were occasions where she was "still coming in" to work even though she was "not in the right mental space" and did not "have the mental capacity to perform." (DRPSAF ¶ 5.) However, she does not provide evidence of any specific instance where she chose not to take FMLA leave because of Wallace's comments. In addition, while Williams testified that Wallace's messages confused her, she also testified that, in November 2022, she spoke to her therapist to seek accurate information. (Def.'s Statement of Material Facts Ex. B, Williams Dep. Tr. 185:14–186:1, Dkt. No. 26-2.) Her therapist informed her that Wallace's guidance about use of intermittent FMLA leave was legally inaccurate. (*Id.*) And Williams testified that after speaking with her therapist she understood that she was entitled to intermittent FMLA leave. (*Id.*) Williams did note in her deposition that she was "still unclear" on the issue, given the conflicting information from HR. (*Id.* at 186:2–7.) But her undisputed course of conduct shows that she relied on the understanding she gained from speaking with her therapist.

Williams took intermittent FMLA leave on November 15, 2022—just four days after Wallace's purportedly threatening message. (PRDSMF ¶ 67.) She then took intermittent FMLA leave for flare-ups on December 4 and December 5, 2022, and January 10, January 15, February 7, March 1, March 13, April 10–16, May 18, June 27, June 28, July 2, July 3, July 9, and July 11, 2023. (*Id.* ¶¶ 67, 69.) By Williams's own testimony she knew, at least throughout June and July 2023, that she could still take intermittent FMLA leave for flare-ups. (Williams Dep. Tr. 208:14–17, 209:16–19, 210:15–21, 211:19–22, 212:15–19, 213:17–19.)

Despite what Wallace told her, the undisputed facts show that Williams knew she was allowed to take intermittent FMLA leave for her flare-ups and that she continued to do so regularly. She has not come forward with any specific evidence supporting the claim that she occasionally came into work when she otherwise would have taken leave. As a result, Williams has not presented evidence of prejudice, an essential element of her interference claim. Williams's interference theory cannot survive summary judgment.

**II. Retaliation**

An FMLA retaliation "claim requires proof of discriminatory intent—evidence that the employer was acting under a prohibited animus." *Chitwood v. Ascension Health All.*, 168 F.4th 493, 498 (7th Cir. 2026) (internal quotation marks omitted). As in many employment-discrimination cases, the question of retaliation in this case turns on whether there is evidence of Endurance's intent. *See Ortiz v. Werner Enters.*, 834 F.3d 760, 765 (7th Cir. 2016) (reiterating that in employment-discrimination cases the operative "legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that" a "proscribed factor caused the [plaintiff's] discharge or other adverse employment action"). Endurance claims that Willaims was fired because of her poor performance. Williams disputes that claim and asserts that Endurance retaliated against her for taking FMLA leave.

To prevail on her retaliation claim, Williams must show that: (1) she engaged in a protected activity; (2) the employer took a materially adverse employment action against her; and (3) there is a causal connection between the two. *Chitwood*, 168 F.4th at 498. The parties do not dispute the first two elements. However, the Court notes that the only materially adverse employment action described by Williams is her ultimate termination. Neither negative performance evaluations, standing alone, nor the implementation of PIPs, constitute materially

adverse actions. *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014). Thus, the question is whether there is sufficient evidence of a causal connection between Williams's termination and her use of FMLA leave.

A plaintiff can establish a causal nexus through a direct admission from the employer or through circumstantial evidence. *Id.* at 800. Such circumstantial evidence might include "suspicious timing, ambiguous statements from which retaliatory intent can be inferred, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." *Id.* However, the Seventh Circuit has "repeatedly held that 'temporal proximity' or suspicious timing alone is rarely sufficient to overcome a motion for summary judgment." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 221 (7th Cir. 2015). And on summary judgment, "circumstantial evidence must point directly to the conclusion that an employer was illegally motivated, without reliance on speculation." *Langenbach*, 761 F.3d at 800 (internal quotation marks omitted).

Williams points to three pieces of evidence to support her claim of retaliation. First, she argues that the message from Wallace, which stated that Williams may face disciplinary action for calling in sick due to her condition, establishes Endurance's retaliatory intent. Second, she argues that, prior to requesting FMLA leave, Endurance had no issue with her performance. In her view, its criticisms of her performance only began in earnest after she took leave. Finally, she argues that Endurance's approach to improving her performance was "micromanagement" that set her up to fail.

None of these arguments support a causal link between Williams's FMLA leave and her termination. First, while Wallace's message to Williams misstated what kinds of absences qualify for FMLA leave, it came almost eight months before Williams was ultimately fired. In

those intervening months, Williams continued to take intermittent FMLA leave without consequence. It is difficult to see how the message could plausibly imply Endurance's animus, especially given there is no evidence that Wallace was involved in the decision to fire Williams. *See Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 351 (7th Cir. 2009) (noting that, generally, to prevail on a retaliation claim a plaintiff must provide evidence that the ***decisionmaker*** has acted for a prohibited reason).

Second, it is undisputed that Endurance did take issue with Williams's performance before she requested FMLA leave. Williams did not apply for FMLA leave until April 15, 2022. Yet she was placed on the Acceleration Team because she failed to meet sales targets in the period prior to April 1, 2022. "While a sudden decline in performance evaluations after an employee engages in a protected activity may provide circumstantial evidence of discriminatory intent, a decline in performance before the employee engages in protected activity does not allow for an inference of retaliation." *Id.* at 354. Moreover, the more important temporal consideration is that her performance was consistently below expectations throughout the period preceding her ***termination***, which is the only relevant adverse employment action in this case. The undisputed facts show that Williams had a track record of poor performance that stretched over a year—starting before she first engaged in a protected activity—before she was fired. And while Williams asserts she was fired for taking FMLA leave, she has not presented evidence that any factor other than her performance was considered prior to her termination.[4]

[4] Williams disputes Endurance's statement that her termination was due to continued poor job performance. (PRDSMF ¶ 73.) She also disputes Endurance's claim that Endurance's leadership team discussed her performance issues but never discussed her use of FMLA leave. (*Id.* ¶ 74.) In doing so, she points out that Endurance's representative who testified pursuant to Federal Rule of Civil Procedure 30(b)(6) was not involved in the conversations where leadership decided to terminate Williams and did not recall the specifics of other conversations about Williams. (*Id.*) Nonetheless, Williams does not

"Summary judgment for the employer is proper where the employer provides undisputed evidence that the adverse employment action is based upon the employee's poor job performance." *Curtis*, 807 F.3d at 221. Significantly, the "FMLA does not require an employer to adjust its performance standards for the time an employee is actually on the job, but it can require that performance standards be adjusted to avoid penalizing an employee for being absent during FMLA-protected leave." *Pagel v. TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012). Here, however, such an adjustment was unnecessary. It is undisputed that Williams's target metrics (e.g., INBCR, OBCR, ACW) were rate-based metrics that did not consider when or how often an employee worked. Still, as she admitted, her performance on these metrics was consistently below expectations.

Finally, Williams contends that Endurance's approach to improving her performance changed after she started taking FMLA leave. She felt that the resources she received while on the Acceleration Team were helpful and constructive. In contrast, she argues that the approach Endurance took during later PIPs, after she requested FMLA leave, put unfair pressure on her and amounted to micromanagement that triggered her anxiety. The Court is sensitive to the possibility that Williams found some of Endurance's coaching tactics to be stressful. But the undisputed facts show that Endurance offered her training and resources on how to improve her sales metrics. A "court does not sit as a super-personnel department that reexamines an entity's business decisions." *Id.* at 630 (internal quotation marks omitted). This Court sees no basis to second-guess Endurance's chosen methods of improving employees' sales performance.

---

present evidence in either response, or anywhere else, showing that any decisionmaker at Endurance considered or discussed her FMLA leave as a reason to fire her.

Along similar lines, Williams makes much of the multiple "final" warnings she received. However, she does not provide evidence that Endurance contradicted any internal policy by giving her more than one "final" chance. *Cf. Long*, 585 F.3d at 352–53 ("An employer's departure from its own employment policies can constitute circumstantial evidence of discrimination."). In any case, to the extent Williams experienced inconsistent supervision, which is far from apparent, the alleged inconsistencies do not support a causal link between Williams's termination and her use of FMLA leave.

In sum, Endurance has submitted undisputed evidence that Williams was failing to meet performance standards for over a year before she was fired. Williams, for her part, has not presented any evidence establishing a causal connection between her FMLA leave and her termination. Without such evidence, Williams's claim of retaliation cannot survive summary judgment.

**CONCLUSION**

Defendant's motion for summary judgment (Dkt. No. 24) is granted. Final judgment will be entered in favor of Defendant.

ENTERED:

Dated: September 30, 2026

Andrea R. Wood
United States District Judge